UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

RUDOLF KESZTHELYI,              )
                               )
          Plaintiff,           )
                               )
v.                             )          Case No.  1:05-cv-303
                               )          Judge Edgar
UNITED STATES OF AMERICA,       )
                               )
          Defendant.           )

## MEMORANDUM  AND  ORDER

Plaintiff Rudolf Keszthelyi is the father of convicted criminal defendant and federal prisoner Rudolph Keszthelyi.  Although these two persons share the same last name, they can be distinguished by the fact that the plaintiff/father spells his first name "Rudolf" while the son spells his first name "Rudolph."  Plaintiff brings this suit seeking to set aside the judicial forfeiture of certain property to the United States of America.  The forfeited property consists of two items: (1) The Hartford Mutual Funds, Inc. account 7206782-2 in the name of Rudy Keszthelyi; and (2) American General Annuity contract TE203870 in the name of Rudy Keszthelyi.  The Court will refer to the forfeited property as the Hartford account and the American General account.

On September 14, 2001, this Court entered an amended final order of judicial forfeiture of this property in a civil forfeiture in rem action styled *United States of America v. The Hartford Mutual Funds, Inc., Account Number 7206782-2, in the Name of Rudy Keszthelyi and American General Annuity, Contract Number TE203870, in the Name of Rudy Keszthelyi*, United States District Court for the Eastern District of Tennessee at Chattanooga, Case No. 1:01-cv-11.  The forfeiture arose out of and is directly connected to the criminal conviction of the plaintiff's son in

1

*United States of America v. Rudolph Keszthelyi, also known as "Rudy,"* United States District Court for the Eastern District of Tennessee at Chattanooga, Case No. 1:99-cr-100.

In the present case, plaintiff Rudolf Keszthelyi claims that he has an ownership interest in the forfeited property and there was a lack of due process notice to him of the judicial forfeiture in Case No. 1:01-cv-11. The parties have made cross-motions for summary judgment under Fed. R. Civ. P. 56. After reviewing the record in the light most favorable to the plaintiff, the Court concludes that the summary judgment motion by the United States of America, as amended [Court Doc. Nos. 5, 7], will be granted. The plaintiff's complaint will be dismissed with prejudice and the plaintiff's summary judgment motion [Court Doc. No. 10] will be denied.

## I.    **Plaintiff's Application to Proceed *In Forma Pauperis***

Before ruling on the summary judgment motions, the Court must first address the plaintiff's application to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a). [Court Doc. No. 1]. Magistrate Judge Carter entered an order directing the Clerk of the District Court to file the plaintiff's complaint without prepayment of the standard filing fee. [Court Doc. No. 2].

The Magistrate Judge's order provided that process will not issue until further order of the District Court. The order contains a footnote explaining that: (1) the application for leave to proceed *in forma pauperis* had not yet been reviewed by the District Judge; and (2) the Magistrate Judge's order has no bearing on whether the application will ultimately be granted or denied by the District Judge and whether a filing fee will be assessed.

Before the District Judge could rule on the application, defendant United States made its motion to dismiss the plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. In the alternative, the defendant moves for summary

judgment pursuant to Fed. R. Civ. P. 56. [Court Doc. No. 5]. It is not clear from the record whether the plaintiff has effected service of process upon defendant United States in accordance with Fed. R. Civ. P. 4(i). The United States does not contend that there is a lack of service of process. In any event, the Court concludes that the plaintiff's application for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a) [Court Doc. No. 1] is **GRANTED**. The Court will not require plaintiff Rudolf Keszthelyi to pay the standard civil action filing fee.

## II.     Standard of Review: Fed. R. Civ. P. 56

Summary judgment is proper if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a mater of law. Fed. R. Civ. P. 56(c); *Van Gorder v. Grand Trunk Western Railroad, Inc*., 509 F.3d 265, 268 (6th Cir. 2007); *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported  motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *accord Lovelace v. BP Products North America, Inc*., 252 Fed. Appx. 33, 39 (6th Cir. 2007); *Talley*, 61 F.3d at 1245. Material facts are only those facts that might affect the outcome of the action under the governing substantive law. The applicable substantive law will identify and determine which facts are material. *Anderson*, 477 at 248; *Lovelace*, 252 Fed. Appx. at 39; *Talley*, 61 F.3d at 1245.

As the moving party, defendant United States bears the initial burden of demonstrating there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003); *Talley*, 61 F.3d at 1245. Once the defendant meets this initial burden, the burden shifts to the plaintiff to come forward with more than

mere allegations. To defeat the defendant's summary judgment motion, plaintiff Rudolf Keszthelyi is required to come forward with admissible evidence to support his claim and show that, at the very least, there is a genuine issue of material fact in dispute that precludes summary judgment. *Celotex Corp.*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249; *Van Gorder*, 509 F.3d at 268; *Rodgers*, 344 F.3d at 595. A mere scintilla of evidence is insufficient. There must be evidence on which a fact finder could reasonably find in the plaintiff's favor. *Anderson*, 477 U.S. at 252; *Van Gorder*, 509 F.3d at 268; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000); *Hartsell v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Talley*, 61 F.3d at 1245; *Mitchell v. Toledo Hospital*, 964 F.2d 577, 581-82 (6th Cir. 1992).

Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. Because plaintiff Rudolf Keszthelyi bears the burden of proving that he has a viable claim to the forfeited property, he must present probative facts and admissible evidence showing that he is entitled to summary judgment or there is a genuine issue of material fact in dispute that precludes the Court from granting summary judgment in the defendant's favor. *Id.*; *Van Gorder*, 509 F.3d at 268; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Hartsell*, 87 F.3d at 799.

The Court's role at the summary judgment stage is to determine whether the record contains sufficient facts and admissible evidence from which a fact finder could reasonably find in favor of the plaintiff. *Anderson*, 477 U.S. at 248; *Rodgers*, 344 F.3d at 595; *National Satellite Sports, Inc. v. Eliadis, Inc*., 253 F.3d 900, 907 (6th Cir. 2001); *Talley*, 61 F.3d at 1245. The Court views the facts in the record and all reasonable inferences that can be drawn from those facts in the light most

favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Van Gorder*, 509 F.3d at 268; *National Satellite Sports*, 253 F.3d at 907. The Court cannot weigh the evidence, judge credibility of witnesses, or determine the truth of matters reasonably in dispute. *Anderson*, 477 U.S. at 249; *Talley*, 61 F.3d at 1245.

## III. Facts and Procedural History

To put plaintiff Rudolf Keszthelyi's complaint into context, it is necessary to summarize the relevant facts and procedural history concerning the underlying criminal case of the plaintiff's son, Rudolph, and the civil judicial forfeiture of the property.

### A. Criminal Conviction and Sentencing of Plaintiff's Son, Rudolph Keszthelyi

The facts of the underlying criminal case are set forth in the Sixth Circuit's opinion affirming the judgment of conviction and sentence on direct appeal. *United States v. Rudolph Keszthelyi,* 308 F.3d 557 (6th Cir. 2002). On March 28, 2000, the federal grand jury returned a third superseding indictment in *United States v. Rudolph Keszthelyi, also known as "Rudy,"* Case No. 1:99-cr-100. The third superseding indictment contained 87 counts. Rudolph Keszthelyi was charged with conspiracy to distribute cocaine hydrochloride, engaging in monetary transactions in criminally derived property (money laundering), distributing cocaine hydrochloride, possessing firearms in connection with drug trafficking, possessing firearms as an alien illegally in the United States, and obstructing justice and attempting to persuade witnesses to withhold testimony. The third superseding indictment contained forfeiture allegations pursuant to 21 U.S.C. § 853 seeking forfeiture of Rudolph Keszthelyi's interest in seven named assets, including the Hartford account and American General account.

On July 5, 2000, pursuant to a written plea agreement, Rudolph Keszthelyi pled guilty to

Count 2, money laundering in violation of 18 U.S.C. § 1957(a), and Count 42, distributing cocaine hydrochloride in violation of 21 U.S.C. § 841. As part of the plea agreement, he agreed to forfeit his Hartford and American General accounts to the United States. Rudolph Keszthelyi executed the plea agreement on July 5, 2000. In exchange for the guilty plea and Rudolph Keszthelyi's agreement to forfeit the property, the United States Attorney agreed to dismiss the remaining numerous criminal charges in the third superseding indictment. The United States entered into and executed the plea agreement based on the understanding that criminal defendant Rudolph Keszthelyi owned the funds in his Hartford and American General accounts and that the funds were proceeds derived from his cocaine trafficking.

During the guilty plea hearing before this District Court on July 5, 2000, criminal defendant Rudolph Keszthelyi made a vague statement that an unspecified portion of the funds in his Hartford and American General accounts were not proceeds derived from his cocaine trafficking but he did not explain what he meant. He admitted that part of the money in these accounts was related to his cocaine trafficking. The District Court made certain Rudolph understood that, as part of his plea agreement, he was agreeing to the complete forfeiture of all funds in his Hartford and American General accounts. Rudolph Keszthelyi indicated to the Court that he agreed and understood that when the United States filed a civil forfeiture in rem action to obtain judicial forfeiture of his Hartford and American General accounts, he would not file a claim, answer, or oppose the judicial forfeiture.

Pursuant to the plea agreement, an agreed preliminary order of forfeiture signed by Rudolph Keszthelyi was filed on July 5, 2000, in Criminal Case No. 1:99-cr-100. It specified that he agreed to the forfeiture of his Hartford and American General accounts as being "proceeds of the drug

6

distribution activities or property used to facilitate his drug distribution activities." This Court approved and entered the agreed preliminary order of forfeiture.

The criminal case next proceeded to the sentencing phase. After the execution of the plea agreement and his guilty plea, Rudolph Keszthelyi began to implement or pursue a strategy designed to undercut or avoid the agreed property forfeiture by raising the contention that he had received substantial amounts of cash money from his father which he held and invested for the father, Rudolf, and should not be the subject of the agreed property forfeiture.

On July 11, 2000, prior to sentencing, the deposition of plaintiff/father Rudolf Keszthelyi was taken in the criminal case while the father was present in Chattanooga, Tennessee. He was examined by criminal defense counsel Peter Strianse and Assistant United States Attorney Paul Laymon. Rudolf Keszthelyi, a citizen and resident of South Africa, testified to the following in his deposition. He said that during a span of about seven years, he mailed various amounts of cash in United States currency from South Africa to his son, Rudolph, in the United States on a monthly basis. The amounts the father claimed to have mailed range from $800 - $1,400 per month. Father Rudolf Keszthelyi admitted that he did not bother to keep a financial ledger or record of the dates and specific amounts of cash that he claimed to have mailed to his son. The father estimated that he mailed approximately $10,000 - $12,000 per year and a grand total of $70,000 - $85,000 in cash to his son, Rudolph. Rudolf Keszthelyi further testified that he directed and instructed his son to save and safely invest the money for the father's retirement.

However, father Rudolf Keszthelyi and son Rudolph did not present any testimony, documents, accounting ledgers, and bank or financial records to show that any cash money from the father was ever actually deposited and invested by son Rudolph in his Hartford and American

General accounts. There was no probative evidence show how or where son Rudolph deposited, invested, managed, or disbursed any of the father's cash money. The ultimate location of the father's alleged cash money payments to the son was undocumented and unproved. There was no evidence directly tracing cash money payments from father Rudolf Keszthelyi as being deposited or transferred into the Hartford account and American General account. Father Rudolf Keszthelyi was not listed or named as an owner on the Hartford and American General accounts. There is no evidence that father Rudolf Keszthelyi ever exercised any dominion and control over the Hartford and American General accounts, such as by personally making direct deposits or withdrawals, managing and directing investments, or receiving copies of financial activity statements on these two accounts.

On November 6, 2000, this Court held the sentencing hearing for Rudolph Keszthelyi. During the sentencing hearing, the issue about father Rudolf Keszthelyi mailing cash money to his son and what happened to it was litigated. The District Court reviewed and considered all of thge evidence, including the deposition of father Rudolf Keszthelyi. This matter is discussed by the Sixth Circuit in *Keszthelyi,* 308 F.3d at 565-66, 576-78. The District Court adopted the federal government's extrapolation theory and found by a preponderance of the evidence that $245,000 in unexplained deposits into Rudolph's financial accounts demonstrated that Rudolph had distributed at least 2.45 kilograms of cocaine hydrochloride. The District Court sentenced Rudolph Keszthelyi to a term of imprisonment for 120 months plus three years of supervised release. He took a direct appeal, and the Sixth Circuit affirmed the judgment of conviction and sentence. *Keszthelyi,* 308 F.3d 557.

During the sentencing hearing on November 6, 2000, there was no evidence presented to

establish that any of the alleged cash money that father Rudolf Keszthelyi claims to have mailed to

his son, Rudolph, was deposited or invested in the Hartford and American General accounts. There

was no evidence showing and tracing how or where son Rudolph deposited, invested, managed, and

disbursed any of his father's cash money. The actual location and disposition of the father's cash

money remained unknown and undocumented at the time of sentencing. This Court determined by

a preponderance of the evidence that all of the funds in the Hartford and American General accounts

were criminal proceeds derived by Rudolph from his cocaine trafficking.

The Sixth Circuit's opinion in *Keszthelyi,* 308 F.3d 557, contains the following discussion

in the section setting forth the facts and procedural history of the criminal case:

> [Rudolph] Keszthelyi disputed the government's extrapolation theory.
> He called a number of witnesses who testified that Keszthelyi regularly
> received parcels containing American currency from his father and a
> friend in South Africa. At a deposition, Keszthelyi's father testified
> that he sent his son between $70,000 and $84,000 over seven years.
> A friend of defendant's, Les Chapman, stated that he had mailed
> Keszthelyi $40,000, mailed in $5,000 monthly increments, during
> 1995. Keszthelyi also attempted to show that [IRS] Agent Barker
> had underestimated his income from E & R Products.
>
> The government presented evidence to rebut Keszthelyi's claims
> that he received money from friends and family in South Africa.
> Agent Barker testified that defendant's bank records did not show
> deposits consistent with the amounts he claimed were sent to him.
> Barker also testified that agents did not find any magazines or letters
> from South Africa during the search of Keszthelyi's home, despite the
> defendant's claim that Chapman sent him money hidden in between
> the pages of magazines from home [South Africa]. Theo Hollamby,
> a police officer from South Africa, also testified that Chapman had
> admitted to lying about sending money to Keszthelyi during an inter-
> view with the South African police.
>
> The district court adopted the government's extrapolation theory, and
> concluded that the $245,000 in unexplained deposits demonstrated that
> Keszthelyi had distributed at least 2.45 kilograms of cocaine.

*Keszthelyi,* 308 F.3d at 565-66.

The Sixth Circuit's opinion goes on to provide the following analysis when affirming the sentence imposed on Rudolph Keszthelyi.

> We conclude that the district court's determination of drug quantity was not clear error. First, we think the government's evidence was sufficient to support a finding that the total amount of unexplained cash deposits made into the defendant's accounts over the relevant time period was attributable to drug sales. The government presented a thorough analysis of Keszthelyi's financial records and other testimonial evidence which convincingly showed that Keszthelyi worked very little during the relevant time period and did not have sufficient legitimate income to explain the cash deposits. (Case Citations omitted). Keszthelyi's primary explanation for the large amount of cash deposited into his accounts was that he received the cash from friends and relatives in South Africa. The district court was entitled to disregard this claim, given Agent Barker's testimony that Keszthelyi's deposits were not consistent with his claims about the amounts that were sent to him and testimony that Chapman admitted to lying about sending money to Keszthelyi. ... Thus, the evidence presented by the government both affirmatively excluded innocent explanations for the cash deposits and showed a constant source of revenue from drug sales that explained these deposits. We conclude that the district court did not clearly err in determining that this evidence was sufficient to establish by a preponderance of the evidence that the cash deposited into defendant's bank accounts represented the proceeds of drug sales.

*Keszthelyi,* 308 F.3d at 577.

**B.   Judicial Forfeiture of Property in Civil Case No. 1:01-cv-11**

Based on these facts and circumstances, the Court finds that beginning in at least July 2000, plaintiff/father Rudolf Keszthelyi had actual knowledge and was on notice that the United States was zealously moving forward and taking action in this District Court to seek forfeiture of the Hartford account and American General account arising out of his son's criminal case. On July 11, 2000, plaintiff/father Rudolf Keszthelyi was present in Chattanooga, Tennessee, and testified by deposition in the criminal case for purposes of the sentencing hearing and the property forfeiture. He answered

many questions concerning the cash money that he claims to have mailed to his son. He either knew, or in the exercise of reasonable care should have known, the terms of his son's plea agreement, the agreed preliminary order of forfeiture signed by son Rudolph on July 5, 2000, and the outcome of the sentencing hearing. It should have come as no surprise to plaintiff Rudolf Keszthelyi that after his son, Rudolph, was convicted and sentenced, the United States government would proceed to seek the complete judicial forfeiture of the Hartford account and American General account.

Because plaintiff Rudolf Keszthelyi had knowledge and was on notice that the United States government was seeking forfeiture of the Hartford and American General accounts in the criminal case, it was incumbent upon him to take reasonable steps necessary to protect and timely pursue any property interest and claim that he may have had concerning those two accounts but he failed and neglected to do so. If plaintiff Rudolf Keszthelyi had a genuine interest and claim to any funds in the Hartford and American General accounts, he should have closely monitored his son's criminal case and the property forfeiture proceedings in this Court. Although plaintiff Rudolf Keszthelyi resided in South Africa, he could have employed a Tennessee attorney to represent and advise him, and take any appropriate legal action necessary to protect his claim to the property subject to forfeiture (Hartford and American General accounts) but he failed and neglected to do so.

On January 5, 2001, the United States of America filed a verified civil complaint for judicial forfeiture in rem styled *United States of America v. The Hartford Mutual Funds, Inc., Account Number 7206782-2, in the Name of Rudy Keszthelyi and American General Annuity, Contract Number TE203870, in the Name of Rudy Keszthelyi*, United States District Court for the Eastern District of Tennessee at Chattanooga, Case No. 1:01-cv-11. The judicial forfeiture action proceeded

under 21 U.S.C. § 881, 18 U.S.C. § 981, and the applicable Supplemental Rules for Admiralty or Maritime Claims which were in effect in 2001. On January 5, 2001, the Clerk of this Court issued a warrant of seizure and arrest in rem of the Hartford account and American General account pursuant to Rule E(4)(b) of the Supplemental Rules for Admiralty or Maritime Claims.

On January 11, 2001, a consent decree for forfeiture was entered by this Court in Case No. 1:01-cv-11. The consent decree was signed by Assistant United States Attorney Paul W. Laymon, Jr., defense counsel Peter Strianse, and Kim Hawkins a/k/a Kim Keszthelyi, the wife of Rudolph Keszthelyi. Kim Hawkins a/k/a Kim Keszthelyi also signed the consent decree for forfeiture for her husband, Rudolph Keszthelyi, pursuant to a power of attorney given to her by Rudolph. The consent decree reiterated the representations that Rudolph Keszthelyi had already personally made in connection with his plea agreement and sentencing. *Rudolph Keszthelyi v. Tune, Entrekin, & White, P.C.*, 2008 WL 1869740, * 4 (E.D. Tenn. April 23, 2008).

The consent decree for forfeiture provides that the United States, Rudolph Keszthelyi a/k/a Rudy Keszthelyi, and Kim Hawkins a/k/a Kim Keszthelyi agree to the following: (1) the Hartford account and American General account constitute proceeds derived from the sale or distribution of cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1); and (2) Rudolph Keszthelyi and Kim Hawkins a/k/a Kim Keszthelyi are the true owners of the Hartford account and American General account, and they agree to forfeit their interests in said property to the United States.

The consent decree further provides that the Court orders, adjudges, and decrees that the Hartford account and American General account constitute proceeds traceable to and derived from the sale or distribution of cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1). The interests of Rudolph Keszthelyi and Kim Hawkins a/k/a Kim Keszthelyi to the Hartford account and

American General account were forfeited to the United States of America pursuant to 21 U.S.C. §881(a)(6) and 18 U.S.C. § 981. It was ordered that the United States Marshals Service publish notice of the forfeiture action (Case No. 1:01-cv-11) and give public notice that any third party having or claiming any interest in the properties must file a claim with the Court within 30 days of the final publication of notice or receipt of actual notice, whichever is earlier, and file an answer to the complaint within 20 days of filing a claim.

Pursuant to the consent decree and 21 U.S.C. § 853(n)(1), incorporated by 18 U.S.C. § 981, the United States Marshals Service published notices of the seizure and arrest in rem of the properties and the forfeiture in rem civil action in two public newspapers: (1) published three times in the Chattanooga Times Free Press, a newspaper of general circulation in Hamilton County, Tennessee, on February 23, March 2, and March 9, 2001; and (2) published three times in the Amarillo Globe News, a newspaper of general circulation in Perry County, Texas, on March 7, 14, and 21, 2001.

It appears from the record in Case No. 1:01-cv-11 that notice of the forfeiture in rem civil action was not mailed to or otherwise served upon plaintiff/father Rudolf Keszthelyi in South Africa. The federal government may have reasonably believed or thought that it was unnecessary to mail a notice of the judicial forfeiture action to Rudolf Keszthelyi in South Africa since the issue concerning his alleged interest in the Hartford account and American General account (based on his mailing cash money to son Rudolph) had in effect already been considered and decided by the District Court during the sentencing phase of son Rudolph's underlying criminal case. Plaintiff Rudolf Keszthelyi did not timely file a claim in the civil forfeiture action. He contends that the reason he did not did not timely file a claim in Case No. 1:01-cv-11 to oppose judicial forfeiture of

the Hartford account and American General account is that he did not receive notice of the civil judicial forfeiture action.

When no third-party claim was filed regarding the seized properties, this District Court entered an amended final order of forfeiture on September 14, 2001. This Court ordered that all right, title, and interest in the Hartford account and American General account are forfeited to and vested in the United States of America.

C.    **Motion to Set Aside Forfeiture and Release Seized Property Pursuant to 18 U.S.C. § 983; No Timely Motion for Relief Under Fed. R. Civ. P. 60(b)(1)**

After entry of the amended final order of civil judicial forfeiture on September 14, 2001, approximately 22 months elapsed. On July 23, 2003, plaintiff Rudolf Keszthelyi filed a *pro se* motion in both his son's criminal Case No. 1:99-cr-100 and the judicial forfeiture cCase No. 1:01-cv-11. The gravaman of the motion was a challenge to the judicial forfeiture in Civil Case No. 1:01-cv-11 predicated on the theory of lack of due process notice. Rudolf Keszthelyi contended that he had not received or been personally served with notice of the civil judicial forfeiture action, and he claimed an interest in the forfeited property. Rudolf Keszthelyi sought to have the September 14, 2001 order of judicial forfeiture in Case No. 1:01-cv-11 set aside pursuant to 18 U.S.C. § 983(e).

On August 8, 2003, this Court issued a memorandum and order denying the motion. The Court determined that 18 U.S.C. § 983(e) was not applicable because it only applies to nonjudicial forfeitures, i.e. administrative forfeitures. The civil forfeiture at issue here is a judicial forfeiture ordered by this Court, not an administrative forfeiture. The Court concluded that it had no authority to grant any relief to Rudolf Keszthelyi from the judicial forfeiture pursuant to 18 U.S.C. § 983(e).

In its response, the government made a plausible suggestion that since the criminal case and

civil judicial forfeiture action had been completed, the District Court should construe Rudolf Keszthelyi's 18 U.S.C. § 983(e) motion as a civil complaint for equitable relief based on *Dusenberry v. United States*, 97 F.3d 1451 (text in 1996 WL 549818 (6th Cir. Sept. 25, 1996)). The Sixth Circuit has held that although Fed. R. Crim. P. 41(g) (formerly Fed. R. Crim. P. 41(e)) allows motions for return of seized property during the course of criminal proceedings, when the owner of the seized property invokes Rule 41 after the close of the criminal proceedings the courts generally treat an untimely Rule 41 motion seeking return of seized property as a civil action in equity.[1] *Id.*; *accord United States v. Obi*, 100 Fed. Appx. 498, 499 (6th Cir. 2004); *United States v. Savage*, 99 Fed. Appx. 583 (6th Cir. 2004); *United States v. Oguaju*, 76 Fed. Appx. 579, 580-81 (6th Cir. 2003); *United States v. Castillo*, 69 Fed. Appx. 676 (6th Cir. 2003); *United States v. Range*, 52 Fed. Appx. 727 (6th Cir. 2002); *United States v. Campbell*, 3 Fed. Appx. 381 (6th Cir. 2001); *United States v. Duncan*, 918 F.2d 647, 653-54 (6th Cir. 1990); *United States v. Young,* 878 F.2d 383 (Table, text in 1989 WL 72465 (6th Cir. July 3, 1989)). An untimely motion for the return of seized property under Fed. R. Crim. P. 41 is in the nature of a civil equitable proceeding. *Savoy v. United States*, 604 F.3d 929, 932-33 (6th Cir. 2010). Based on *Dusenberry,* the government suggested that Rudolf Keszthelyi's motion to set aside the forfeiture order be docketed as a civil complaint for equitable relief and that the United States be allowed 60 days to answer.

This Court declined to adopt the government's suggestion because it would have allowed Rudolf Keszthelyi to bypass or skip the necessary steps of paying the standard civil filing fee and effecting service of process upon the United States. The Court saw no good reason why Rudolf

---

[1] Effective December 1, 2002, Fed. R. Crim. P. 41 was amended and reorganized. What was formerly Rule 41(e) is now set forth in Rule 41(g) with minor stylistic changes.

Keszthelyi should be treated differently from any other plaintiff who wishes to bring a civil action in federal district court. The Court declined to *sua sponte* construe and treat the 18 U.S.C. § 983(e) motion to set aside the forfeiture as an independent civil complaint for equitable relief because he had not paid the civil action filing fee. This Court reasoned that Rudolf Keszthelyi could not avoid payment of the standard civil action filing fee by improperly submitting his motion under 18 U.S.C. § 983(e) in the closed judicial forfeiture case and then have the Court order that the improper motion be converted into or deemed a civil complaint and assigned a new case docket number.

This Court denied Rudolf Keszthelyi's 18 U.S.C. § 983(e) motion to set aside the judicial forfeiture. In light of the government's suggestion based on *Dusenberry,* this Court stated that Rudolf Keszthelyi may, if he so desires, file a civil complaint to set aside the judicial forfeiture on the ground of lack of constitutional due process notice but he would be required to either pay the standard civil action filing fee or make an application to proceed *in forma pauperis* under 28 U.S.C. § 1915(a)(1). This Court expressed no opinion whether Rudolf Keszthelyi might be entitled to any equitable relief from the amended final order of forfeiture entered on September 14, 2001, in Civil Case 1:01-cv-11.

Rudolf Keszthelyi's motion to set aside the judicial forfeiture does not fit within *Dusenberry* as suggested by the United States. In *Dusenberry*, after criminal proceedings had been completed, federal prisoner Dusenberry made a motion under Fed. R. Crim. P. 41(e) for return of his seized property that had been the subject of an administrative forfeiture. Mr. Dusenberry contended that the United States administratively forfeited his property without giving him sufficient notice. The Sixth Circuit held that because the criminal proceedings had been completed before the Rule 41(e) motion was filed, Mr. Dusenberry could not pursue his claim seeking return of the forfeited property

under Rule 41(e). The Sixth Circuit determined that the district court should have construed the untimely Fed. R. Crim. P. 41(e) motion for return of seized property as a civil complaint for equitable relief.

*Dusenberry* is not directly on point with regard to plaintiff Rudolf Keszthelyi's forfeiture issue. Rudolf Keszthelyi's situation is distinguishable from *Dusenberry* in several important respects. Unlike the convicted prisoner in *Dusenberry*, plaintiff Rudolf Keszthelyi is not the convicted defendant in Criminal Case 1:99-cr-100. Rather, it is his son, Rudolph, who is the convicted criminal defendant who possessed the property in question – the Hartford and American General accounts – that was forfeited to the United States. Moreover, Rudolf Keszthelyi did not make a motion for return of seized property under former Fed. R. Crim. P. 41(e). Instead, plaintiff Rudolf Keszthelyi mistakenly brought his motion to set aside the order of forfeiture under 18 U.S.C. § 983(e) which does not apply to judicial forfeitures. Most significantly, *Dusenberry* is distinguishable since it involved an administrative forfeiture, whereas plaintiff Rudolf Keszthelyi moved to set aside a judicial forfeiture.

Further legal research reveals that *Dusenberry* and the line of precedent involving untimely Fed. R. Crim. P. 41 motions for the return of seized property, especially where there has been an administrative forfeiture of the property, are not applicable to Rudolf Keszthelyi's situation. The appropriate procedure for Rudolf Keszthelyi to challenge the final order of judicial forfeiture would have been to make a timely motion in the judicial forfeiture action (Civil Case No. 1:01-cv-11) pursuant to Rule 60(b) of the Federal Rules of Procedure seeking relief from the amended final order of forfeiture entered by this Court on September 14, 2001. Fed. R. Civ. P. 60(b) is the proper vehicle to challenge and seek relief from a federal district court's judgment or order of judicial

forfeiture. *United States v. Roberts*, 282 Fed. Appx. 735, 737 (10th Cir. 2008); *United States v. Rodriguez-Aguirre*, 414 F.3d 1177, 1182 (10th Cir. 2005); *United States v. Twenty-Six Thousand Dollars U.S. Currency*, 64 Fed. Appx. 912 (6th Cir. 2003); *United States v. Aponte-Vega*, 230 F.3d 522 (2nd Cir. 2000); *United States v. Madden*, 95 F.3d 38 (10th Cir. 1996); *United States v. Mosquera*, 845 F.2d 1122, 1126 (1st Cir. 1988).

Rudolf Keszthelyi did not do this. When he made his motion to set aside the order of judicial forfeiture pursuant to 18 U.S.C. § 983(e), Rudolf Keszthelyi did not cite or rely on Fed. R. Civ. P. 60(b). The government did not suggest Fed. R. Civ. P. 60(b) as an appropriate procedure for this Court to consider and rule on the motion. It was correct for the Court not to *sua sponte* convert Rudolf Keszthelyi's 18 U.S.C. § 983(e) motion to set aside the forfeiture into a motion seeking relief from the September 14, 2001 order of judicial forfeiture under Fed. R. Civ. P. 60(b). At that juncture in July 2003, a Rule 60(b) motion by Rudolf Keszthelyi would have been untimely and futile.

Fed. R. Civ. 60(b)(1) provides that on motion, the Court may relieve a party from a final judgment, order, or proceeding for "mistake, inadvertence, surprise, or excusable neglect." Rudolf Keszthelyi contends that the District Court made a mistake of fact or law when it entered the amended final order of judicial forfeiture in Civil Case No. 1:01-cv-11 on September 14, 2001. This contention falls within the "mistake" provision in Fed. R. Civ. P. 60(b)(1).

The problem is one of timeliness. Fed. R. Civ. P. 60(c)(1) provides that a motion for relief under Rule 60(b)(1) must be made no more than one year after entry of the order or judgment. The amended final order of judicial forfeiture was entered on September 14, 2001. Rudolf Keszthelyi did not make a timely motion for relief from the final order of forfeiture pursuant to Rule 60(b)(1)

within the one-year time limit required by Rule 60(c)(1). He did not file his 18 U.S.C. § 983(e) motion to set aside the order or judgment of forfeiture until July 23, 2003, long after the one-year time limit in Rule 60(c)(1) had elapsed and expired. Consequently, it was unnecessary and would have been futile for the Court to construe plaintiff Rudolf Keszthelyi's 18 U.S.C. § 983(e) motion to set aside the forfeiture as a different kind of motion seeking relief from the September 14, 2001 amended final order of judicial forfeiture under the "mistake" provision of Fed. R. Civ. P. 60(b)(1). *Cf. Aponte-Vega*, 230 F.3d 522; *Twenty-Six Thousand Dollars U.S. Currency*, 64 Fed. Appx. 912.

Moreover, it is exceedingly doubtful that plaintiff Rudolf Keszthelyi could have met his burden of showing that he was entitled to relief under Fed. R. Civ. P. 60(b)(1) and that he could ultimately prevail on his claim to an ownership interest in the forfeited Hartford and American General accounts. The issue concerning Rudolf Keszthelyi's alleged ownership interest in the Hartford and American General accounts, based on his mailing cash money to son Rudolph, had previously been considered and decided by this District Court by a preponderance of the evidence during the sentencing hearing in Rudolph's underlying criminal case. As discussed *supra,* plaintiff Rudolf Keszthelyi did not have any probative evidence to prove that any cash money he may have mailed was ever actually deposited and invested by son Rudolph in the Hartford and American General accounts. The actual location of any cash money that plaintiff Rudolf Keszthelyi may have mailed to his son has not been adequately documented and proved. There is no probative evidence tracing any alleged cash money payments from Rudolf Keszthelyi as being deposited or invested in the Hartford and American General accounts which were maintained in the name of son Rudolph.

IV.    **Analysis of Present Complaint to Set Aside Judicial Forfeiture**

Plaintiff Rudolf Keszthelyi brings the present suit seeking equitable relief to set aside the

judicial forfeiture of the Hartford account and the American General account. He seeks to set aside the amended final order of judicial forfeiture entered on September 14, 2001, in Civil Case No. 1:01-cv-11. Plaintiff attaches to his complaint the sworn affidavit of his son, Rudolph.

One unusual twist is that the complaint has been prepared, signed, and filed by the plaintiff's son, convicted defendant and federal prisoner Rudolph Keszthelyi. Rudolph contends that he has the authority to act for and on behalf of his father based on a power of attorney. Federal prisoner Rudolph Keszthelyi, under the device of representing his father based on a power of attorney, seeks to reopen and relitigate the closed civil judicial forfeiture case regarding the forfeited Hartford and American General accounts. This is the exact same property that Rudolph previously consented to forfeit as being proceeds derived from his cocaine trafficking and to which he represented himself to be the true owner.

The Court concludes that the United States of America is entitled to summary judgment under Fed. R. Civ. P. 56 and the plaintiff's complaint must be dismissed for the following reasons.

### A.      Collateral Estoppel and Rudolph Keszthelyi's Affidavit

The affidavit of son Rudolph Keszthelyi lacks probative value. Rudolph is collaterally estopped to deny that the funds in his forfeited Hartford and American General accounts were proceeds derived from his criminal cocaine trafficking. Under the doctrine of collateral estoppel, also commonly referred to as issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979); *accord Hammer v. Immigration and Naturalization Service*, 195 F.3d 836, 840 (6th Cir. 1999). The doctrine of collateral estoppel reflects the policy that one full opportunity

to litigate an issue is sufficient. *Id.*; *Hickman v. Commissioner*, 183 F.3d 535, 537 (6th Cir. 1999).

Collateral estoppel applies when: (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation; (2) the issue was actually litigated and decided by the court in the prior litigation; (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation; (4) the party to be estopped was a party to the prior litigation or in privity with such party; and (5) the party to be estopped had a full and fair opportunity to litigate the issue. *Hammer*, 195 F.3d at 840; *see also Santana-Albarran v. Ashcroft*, 393 F.3d 699, 704 (6th Cir. 2005); *Verizon North, Inc. v. Strand*, 367 F.3d 577, 583 (6th Cir. 2004).

All the elements of collateral estoppel are met here with regard to the statements now made by federal prisoner Rudolph Keszthelyi in his affidavit attached to the plaintiff's complaint. During the sentencing hearing in *United States v. Rudolph Keszthelyi*, Case No. 1:99-cr-100, this Court considered the evidence and decided the issue whether the funds in the Hartford and American General accounts were either proceeds derived by Rudolph from his cocaine trafficking or instead money mailed to him by plaintiff/father Rudolf Keszthelyi from South Africa. This Court ruled against Rudolph Keszthelyi on this precise issue. The District Court determined by a preponderance of the evidence at the sentencing hearing that all of the funds in the Hartford and American General accounts were proceeds derived by Rudolph from his cocaine trafficking and that none of said funds constituted or represented cash money mailed to him by his father, Rudolf Keszthelyi. This is the identical issue that is the subject of Rudolph's current affidavit. Moreover, in the judicial civil forfeiture Case No. 1:01-cv-11, Rudolph Keszthelyi admitted that he was the true owner of the Hartford and American General accounts.

Collateral estoppel applies because this same issue was actually litigated and decided by this

District Court during the sentencing hearing in prior criminal Case No. 1:99-cr-100. The resolution of the issue was necessary and essential to the imposition of sentence and entry of the judgment of conviction in the criminal case. Rudolph Keszthelyi had a full and fair opportunity to litigate the issue during the sentencing hearing. He presented for the Court's consideration the sworn deposition testimony of his father, plaintiff Rudolf Keszthelyi. Consequently, federal prisoner Rudolph Keszthelyi is collaterally estopped from relitigating the same issue on behalf of his father via the device of a power of attorney. As far as Rudolph Keszthelyi is concerned, this identical issue has been previously decided and adjudicated by this Court during the sentencing hearing in his criminal case. Consequently, Rudolph Keszthelyi is collaterally estopped from making a sworn statement in an affidavit denying that all of the funds in his forfeited Hartford account and American General account were proceeds derived from his cocaine trafficking.

Application of collateral estoppel negates any possible probative value of Rudolph's affidavit. Rudolph, who previously represented to this Court in the judicial forfeiture action that the funds in his forfeited Hartford and American General accounts were owned by him and were proceeds derived from his criminal cocaine trafficking, cannot create a genuine disputed issue of material fact in the present case by contradicting himself. Rudolph's current affidavit has no probative value, is not admissible evidence, and cannot be considered by the Court for purposes of summary judgment analysis under Fed. R. Civ. P. 56.

Because the doctrine of collateral estoppel negates the probative value of Rudolph's affidavit, plaintiff Rudolf Keszthelyi does not have any new, additional facts and admissible evidence to present to this Court in support of his complaint to set aside the judicial forfeiture. Plaintiff Rudolf Keszthelyi does not have any probative evidence to prove that any cash money he

claims to have mailed to his son, Rudolph, from South Africa was ever actually deposited and invested in the forfeited Hartford and American General accounts.

Furthermore, for purposes of applying the doctrine of collateral estoppel, plaintiff Rudolf Keszthelyi stands in privity with his son, Rudolph. The doctrine of collateral estoppel in this case applies not only to son Rudolph, but also applies with equal force to plaintiff Rudolf Keszthelyi. Although plaintiff Rudolf Keszthelyi was not a party to son Rudolph's criminal case, he stands in privity with Rudolph regarding the issue that was litigated and decided by the District Court during the sentencing hearing in the criminal case, i.e. whether all of the funds in the Hartford and American General accounts were criminal proceeds derived by Rudolph from his cocaine trafficking or instead money that Rudolf Keszthelyi mailed to Rudolph from South Africa.

When applying the doctrines of *res judicata* and collateral estoppel (issue preclusion), the term "privity" means a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented in the earlier action. *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007); *Sanders Confectionary Products, Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 481 (6th Cir. 1992). The Court finds that plaintiff Rudolf Keszthelyi stands in privity with son Rudolph because any property interests that the plaintiff may have had in the Hartford and American General accounts were adequately represented and zealously advocated by son Rudolph and his defense counsel during the sentencing hearing in the criminal Case No. 1:99-cr-100.

In the context of *res judicata* and collateral estoppel, privity does not denote a legal relationship between plaintiff Rudolf Keszthelyi and his son, Rudolph. Instead, privity concerns a shared identity of interests relating to the subject matter of the litigation. Privity is not established by plaintiff Rudolf Keszthelyi and son Rudolph being legally connected by a contract, principal-

agent relationship, blood, or some other means. Rather, the issue of privity turns on whether they shared an identity of interests, that is, a mutual or successive interest to the same rights concerning the source of the funds and who had an ownership interest in the Hartford and American General accounts. *Hanger Prosthetics & Orthotics East, Inc. v. Henson*, 299 Fed. Appx. 547, 555-56 (6th Cir. 2008); *Hutcherson v. Lauderdale County, Tennessee*, 326 F.3d 747, 759 (6th Cir. 2003); *McKennon v. Patel*, 2011 WL 887727, * 3 (E.D. Tenn. March 14, 2011); *Stewart v. Deutsche Bank National Trust Co.*, 2010 WL 4004670, ** 5-6 (E.D. Tenn. Oct. 12, 2010); *Harris v. St. Mary's Medical Center, Inc.*, 726 S.W.2d 902, 905 (Tenn. 1987); *Edwards v. City of Memphis*, 2009 WL 2226222, * 3 (Tenn. Ct. App. July 27, 2009); *Tennessee ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 180 (Tenn. Ct. App. 2000).

During the sentencing hearing in Rudolph's criminal case, Rudolph and plaintiff/father Rudolf Keszthelyi shared a strong identity of interests. They shared an identical mutual interest in seeking to prove that father Rudolf was the source of the funds and he had an ownership interest in the Hartford and American General accounts. During the sentencing hearing, Rudolph vigorously argued and sought to prove that the vast majority of the funds in the Hartford and American General accounts were not proceeds derived from his cocaine trafficking, but rather constituted or represented cash money that plaintiff/father Rudolf Keszthelyi had mailed to Rudolph from South Africa. Criminal defendant Rudolph zealously pursued this contention in an unsuccessful effort to decrease the amount of cocaine that he would be held responsible for distributing and reduce the length of his sentence of imprisonment. To assist Rudolph and to also seek recovery of money for himself, plaintiff/father Rudolf Keszthelyi testified by deposition during sentencing phase and his deposition was considered by this Court. Thus, Rudolph and plaintiff/father Rudolf Keszthelyi

shared an identity of interests and their mutual interests were fully aligned during the sentencing hearing in Rudolph's criminal case. With regard to the issue of proving the source of the funds and who had a true ownership interest in the Hartford and American General accounts, Rudolph more than adequately represented plaintiff/father Rudolf Keszthelyi. This Court ultimately ruled against them during the sentencing hearing based on a preponderance of the evidence. Consequently, plaintiff Rudolf Keszthelyi is collaterally estopped from relitigating the same issue in the instant case wherein he seeks to set aside the final order of judicial forfeiture entered on September 14, 2001, in Civil Case No. 1:01-cv-11.

**B.**     **Plaintiff Did Not Timely File Motion for Relief from Final Order of Judicial Forfeiture Under Fed. R. Civ. P. 60(b)**

As discussed *supra*, the appropriate procedure for plaintiff Rudolf Keszthelyi to challenge and seek relief from the amended final order of judicial forfeiture entered on September 14, 2001, in Civil Case No. 1:01-cv-11, would be for him to make a timely motion in Civil Case No. 1:01-cv-11 pursuant to Fed. R. Civ. P. 60(b) which he has failed to do. *Roberts*, 282 Fed. Appx. at 737; *Rodriguez-Aguirre*, 414 F.3d at 1182; *Twenty-Six Thousand Dollars U.S. Currency*, 64 Fed. Appx. 912; *Aponte-Vega*, 230 F.3d 522; *Madden*, 95 F.3d 38; *Mosquera*, 845 F.2d at 1126.

The fundamental question here is whether plaintiff Rudolf Keszthelyi can obtain relief from the amended final order of judicial forfeiture pursuant to Fed. R. Civ. P. 60(b). The Court concludes that he cannot do so. Fed. R. Civ. P. 60(b) provides in pertinent part: "On motion and just terms, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect; ... or (6) any other reason that justifies

relief." By providing that a court "may" relieve a party from a judgment or order, Rule 60(b) allows for the exercise of some judicial discretion in determining whether to grant relief. *McCurry v. Adventist Health System/Sunbelt, Inc.*, 298 F.3d 586, 592 (6th Cir. 2002). Plaintiff Rudolf Keszthelyi bears the burden of establishing that he is entitled to relief under Rule 60(b). *Id.*

Relief under Rule 60(b) is circumscribed by the policy favoring the finality of judgments and the termination of litigation. *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 468 (6th Cir. 2007); *GenCorp, Inc. v. Olin Corp.*, 477 F.3d 368, 372 (6th Cir. 2007); *Stokes v. Williams*, 475 F.3d 732, 735 (6th Cir. 2007); *McCurry*, 298 F.3d at 592; *Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001); *Waifersong Ltd., Inc. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir. 1992).

This is especially true for the catch-all provision in Rule 60(b)(6) because it applies only in exceptional or extraordinary circumstances not addressed by Rule 60(b)(1)-(5). Courts apply Rule 60(b)(6) as a means to achieve substantial justice when something more than one of the grounds in Rule 60(b)(1)-(5) is present. The "something more" must include unusual, extreme situations where principles of equity mandate relief. *Broach v. City of Cincinnati*, 244 Fed. Appx. 729, 735 (6th Cir. 2007); *Ford Motor Co.*, 487 F.3d at 468-69; *GenCorp*, 477 F.3d at 372-73; *Stokes*, 475 F.3d at 735; *McCurry*, 298 F.3d at 592, 595-96; *Jalapeno Property Management, LLC v. Dukas,* 265 F.3d 506, 509 (6th Cir. 2001); *Jinks v. Allied Signal, Inc.,* 250 F.3d 381, 387 (6th Cir. 2001); *Blue Diamond Coal*, 249 F.3d at 524; *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 365-66 (6th Cir. 1990); *Hopper v. Euclid Manor Nursing Home*, *Inc.*, 867 F.2d 291, 294 (6th Cir. 1989).

Situations involving exceptional or extraordinary circumstances that warrant relief under Rule 60(b)(6) are rare because almost every conceivable ground for relief from a judgment or order

is already covered under Rule 60(b)(1)-(5).  *Ford Motor Co.*, 487 F.3d at 469; *McCurry*, 298 F.3d at 592, 595; *Blue Diamond Coal*, 249 F.3d at 524.  If a motion falls within the scope one of the circumstances or grounds for relief provided in Rule 60(b)(1)-(5), the Court is foreclosed from awarding relief for "any other reason" pursuant to Rule 60(b)(6).  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 392-93 (1993); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 and n. 11 (1988); *McCurry*, 298 F.3d at 595-96; *Olle*, 910 F.2d at 366.

To the extent plaintiff Rudolf Keszthelyi contends that the amended final order of judicial forfeiture entered on September 14, 2001, in Civil Case No. 1:01-cv-11 should be set aside based on the ground of mistake, the contention falls within the scope of Rule 60(b)(1) and cannot be addressed under Rule 60(b)(6).  *Okoro v. Hemingway*, 481 F.3d 873, 874 (6th Cir. 2007); *Hopper*, 867 F.2d at 294 (claim of legal error falls into the category of "mistake" under Rule 60(b)(1) and is not cognizable under Rule 60(b)(6) absent exceptional circumstances).  The Court cannot apply Rule 60(b)(6) to award relief that is foreclosed under Rule 60(b)(1).  Rule 60(b)(1) and 60(b)(6) are mutually exclusive.  Relief may be available under Rule 60(b)(6) only in the event that none of the grounds set forth in Rule 60(b)(1) - (5) apply.  The Court is  required to analyze a motion claiming a mistake of fact or error of law under the "mistake" provision in Rule 60(b)(1), not Rule 60(b)(6).  *McCurry*, 298 F.3d at 596; *McDowell v. Dynamics Corp. of America*, 931 F.2d 380, 383-84 (6th Cir. 1991); *Olle*, 910 F.2d at 365-66.

Fed. R. Civ. P. 60(c)(1) provides that a motion for relief under Rule 60(b)(1) must be made no more than one year after entry of the order or judgment.  The amended final order of judicial forfeiture was entered by this Court on September 14, 2001.  Plaintiff Rudolf Keszthelyi did not

make a timely motion for relief from the final order of forfeiture pursuant to Rule 60(b)(1) within the one-year time limit required by Rule 60(c)(1). Consequently, he is not entitled to any relief under Rule 60(b)(1).

Even if we assume *arguendo* that plaintiff Rudolf Keszthelyi could bring a motion for relief from the order of judicial forfeiture pursuant to Fed. R. Civ. P. 60(b)(6), the Court concludes that any such Rule 60(b)(6) motion fails and must be denied. A Rule 60(b)(6) motion at this juncture would be untimely. Fed. Civ. P. 60(c)(1) provides that a motion for relief under Rule 60(b)(6) must be made within a "reasonable time." This Court entered the amended final order of judicial forfeiture in Civil Case No. 1:01-cv-11 on September 14, 2001. Plaintiff Rudolf Keszthelyi filed this civil action more than four years after the order of judicial forfeiture. If the Court were to liberally construe and treat the plaintiff's civil complaint in this suit as a Rule 60(b)(6) motion for relief from the September 14, 2001 order of judicial forfeiture, the lapse of four years is unreasonable. Plaintiff did not file a Rule 60(b)(6) motion within a reasonable time as required by Rule 60(c)(1).

Moreover, Rule 60(b)(6) applies only in exceptional or extraordinary circumstances where principles of equity mandate relief. Plaintiff Rudolf Keszthelyi has not met that rigorous standard in this case. The Court is not persuaded that the plaintiff has presented exceptional or extraordinary circumstances where principles of equity mandate that he be granted relief from the order of judicial forfeiture under Rule 60(b)(6). With regard to the judicial forfeiture of the Hartford and American General accounts, the balance of the equities do not weigh in his favor. Based on the totality of the facts and circumstances, the Court finds that principles of equity do not warrant granting extraordinary relief to plaintiff Rudolf Keszthelyi from the judicial forfeiture under Rule 60(b)(6).

## C.    <u>Lack of Standing to Contest Forfeiture</u>

The Court finds that plaintiff Rudolf Keszthelyi lacks standing to contest the judicial forfeiture of the Hartford and American General accounts.  To be able to contest the judicial forfeiture, plaintiff Rudolf Keszthelyi bears the burden of showing that he has standing under both Article III of the United States Constitution and the applicable federal forfeiture statutes.  *United States v. $64,800.00 in United States Currency,* 21 Fed. Appx. 439 (6th Cir. 2001); *United States v. 1978 Cessna Turbo 210,* 182 F.3d 919 (Unpublished, text in 1999 WL 407469, * 3 (6th Cir. June 2, 1999)); *United States v. $515,060.42 in United States Currency,* 152 F.3d 491, 497-501 (6th Cir. 1998); *United States v. Certain Real Property Located at 16397 Harden Circle*, 145 F.3d 1334 (Unpublished, text in 1998 WL 245991, ** 2-3 (6th Cir. May 7, 1998)); *United States v. Currency $267,961.07,* 916 F.2d 1104, 1107 (6th Cir. 1990).

With respect to Article III standing, the plaintiff is required to show that he has a colorable ownership, possessory, or security interest in at least a portion of the forfeited property.  *$64,800.00 in United States Currency,* 21 Fed. Appx. at 440; *1978 Cessna Turbo 210,* 1999 WL 407469, at * 3; *$515,060.42 in United States Currency,* 152 F.3d at 497; *United States v. 16510 Ashton,* 47 F.3d 1465, 1470 (6th Cir. 1995); *Currency $267,961.07,* 916 F.2d at 1107.  To satisfy the threshold issue of Article III standing, plaintiff Rudolf Keszthelyi need not prove the merits of his underlying claim but he must present supporting facts and some evidence showing that he has a facially colorable interest in the forfeited property.  *$64,800.00 in United States Currency,* 21 Fed. Appx. at 440; *1978 Cessna Turbo 210,* 1999 WL 407469, at * 3; *$515,060.42 in United States Currency,* 152 F.3d at 497-501; *United States v. 37.29 Pounds of Semi-Precious Stones,* 7 F.3d 480, 483 (6th Cir. 1993).  Facially colorable claims which confer Article III standing are ordinarily based on ownership

interests, but other property interests less than ownership – possession or a secured creditor – may in some cases suffice to create standing. *$515,060.42 in United States Currency,* 152 F.3d at 498. An ownership interest may be evidenced in a number of ways, including proof of possession, control, legal title, and financial stake. *$64,800.00 in United States Currency,* 21 Fed. Appx. at 440; *1978 Cessna Turbo 210,* 1999 WL 407469, at ** 3-4.

This Court finds that plaintiff Rudolf Keszthelyi has not met his burden of showing that he has Article III standing to contest the judicial forfeiture of the Hartford and American General accounts. He has not presented sufficient supporting facts and admissible evidence to establish that he has a facially colorable claim to the particular forfeited property. Plaintiff Rudolf Keszthelyi has failed to show that he had an ownership interest in the forfeited Hartford and American General accounts. There are no supporting facts and evidence to show that he held legal title to or had a financial stake in the forfeited property. There are no facts and evidence demonstrating that he ever possessed or exercised any dominion and control over the Hartford and American General accounts. On the contrary, it was son Rudolph who held legal title, possessed, and exercised dominion and control over the Hartford and American General accounts.

Plaintiff Rudolf Keszthelyi may be a general unsecured creditor of Rudolph but an unsecured creditor lacks standing to contest a forfeiture of the debtor's property. While a general unsecured creditor may have a general interest in the property of debtor from whom assets were seized by the federal government, unsecured creditor Rudolf Keszthelyi has not established that he had a sufficient interest in the particular property – Hartford and American General accounts – that was seized and forfeited to the United States to create Article III standing to contest the judicial forfeiture. *United States v. $20,193.39 U.S. Currency*, 16 F.3d 344, 346 (9th Cir. 1994); *United States v. $9,250.00 in*

*U.S. Currency*, 2010 WL 3168628, * 4 (D. Ariz. Aug. 10, 2010); *United States v. $38,852.00 in U.S. Currency*, 328 F. Supp.2d 768, 769 (N.D. Ohio 2004); *United States v. $124,906.00 in U.S. Currency*, 2000 WL 360086 (D. Ore. March 31, 2000); *United States v. $3,000 in Cash*, 906 F. Supp. 1061, 1065 (E.D. Va. 1995).

Moreover, plaintiff Rudolf Keszthelyi also lacks standing to contest the judicial forfeiture of the Hartford and American General accounts under the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983. Plaintiff contends that he is an innocent owner of the forfeited Hartford and American General accounts under 18 U.S.C. § 983(d). This contention fails.

18 U.S.C. § 983(d)(1) provides: "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d)(6)(A) provides that the term "owner" means "a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest." 18 U.S.C. § 983(d)(6)(B)(i) provides that the term "owner" does not include "a person with only a general unsecured interest in, or claim against, the property or estate of another."

The Court concludes that plaintiff Rudolf Keszthelyi cannot meet his burden of proving by a preponderance of the evidence that he is an innocent owner of any portion of the forfeited Hartford and American General accounts under 18 U.S.C. § 983(d). Plaintiff Rudolf Keszthelyi has not presented any probative facts and admissible evidence to show that he was an owner and had an ownership interest in the forfeited Hartford and American General accounts as required by 18 U.S.C. § 983(d)(6)(A). Plaintiff did not have legal title, possession, or a security interest in the forfeited

Hartford and American General accounts. At most, plaintiff Rudolf Keszthelyi was a general unsecured creditor of his son, Rudolph, but this is not enough to establish standing and make out a viable innocent owner claim under § 983(d). 18 U.S.C. § 983(d)(6)(B)(i); *United States v. Currency $11,331*, 482 F. Supp.2d 873, 881 (E.D. Mich. 2007).

## V.    Conclusion

The plaintiff's application pursuant to 28 U.S.C. § 1915(a) for leave to proceed *in forma pauperis* is **GRANTED**.

The motion for summary judgment by defendant United States of America, as amended [Court Doc. Nos. 5, 7] is **GRANTED** pursuant to Fed. R. Civ. P. 56. The plaintiff's complaint is **DISMISSED WITH PREJUDICE**. The plaintiff's summary judgment motion [Court Doc. No. 10] is **DENIED**. A separate judgment will be entered.

The Clerk of Court is directed to mail a copy of this memorandum and order and the accompanying judgment to plaintiff Rudolf Keszthelyi at his last known address P.O. Box 10599, Marine Parade 4056, KwaZulu Natal, South Africa.

SO ORDERED.

Dated: May 16, 2011.


            */s/ R. Allan Edgar*
            R. ALLAN EDGAR
            UNITED STATES DISTRICT JUDGE